No. 3:23-cv-02567

=====================================

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

=====================================

In re: LTL MANAGEMENT, LLC

*Debtor.*

---

OFFICIAL COMMITTEE OF TALC CLAIMANTS, *et al.*,

*Petitioners- Appellants,*

-v.-

LTL MANAGEMENT LLC,

*Debtor-Appellee.*

---

Appeal from the United States Bankruptcy Court for the District of
New Jersey in Ch. 11 No. 23-12825 and Adv. Pro. No. 23-01092

---

## OPENING BRIEF FOR APPELLANT
## OFFICIAL COMMITTEE OF TALC CLAIMANTS

---

*Counsel for Appellant Official Committee of Talc Claimants listed on inside cover*

**MOLOLAMKEN LLP**
Jeffrey A. Lamken, Esq.
(*pro hac vice motion pending*)
jlamken@mololamken.com
600 New Hampshire Ave., N.W.,
Washington, DC 20037
Tel; (202) 556-2010

**MASSEY & GAIL LLP**
Jonathan S. Massey, Esq.
(*pro hac vice motion pending*)
Bret Vallacher, Esq.
(*pro hac vice motion pending*)
jmassey@masseygail.com
bvallacher@masseygail.com
1000 Maine Ave. SW, Suite 450
Washington, DC  20024
Tel: (202) 652-4511
Fax: (312) 379-0467

**BROWN RUDNICK LLP**
David J. Molton, Esq.
Robert J. Stark, Esq.
Michael S. Winograd, Esq.
Eric R. Goodman, Esq.
dmolton@brownrudnick.com
rstark@brownrudnick.com
mwinograd@brownrudnick.com
egoodman@brownrudnick.com
Seven Times Square
New York, NY  10036
Tel: (212) 209-4800
Fax: (212) 209-4801

and

Jeffrey L. Jonas, Esq.
Sunni P. Beville, Esq.
jjonas@brownrudnick.com
sbeville@brownrudnick.com
One Financial Center
Boston, MA  02111
Tel: (617) 856-8200
Fax: (617) 856-8201

**OTTERBOURG P.C**.
Melanie L. Cyganowski, Esq.
Richard G. Haddad, Esq.
Adam C. Silverstein, Esq.
Jennifer S. Feeney, Esq.
David A. Castleman, Esq.
mcyganowski@otterbourg.com
rhaddad@otterbourg.com
asilverstein@otterbourg.com
jfeeney@otterbourg.com
dcastleman@otterbourg.com
230 Park Avenue
New York, NY  10169
Tel: (212) 661-9100
Fax: (212) 682-6104

**GENOVA BURNS LLC**
Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
Gregory S. Kinoian, Esq.
dstolz@genovaburns.com
dclarke@genovaburns.com
gkinoian@genovaburns.com
110 Allen Road, Suite 304
Basking Ridge, NJ  07920
Tel: (973) 467-2700
Fax: (973) 467-8126

*Counsel for Appellant Official Committee of Talc Claimants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1 and Federal Rule of Bankruptcy Procedure 8012, counsel for Appellant hereby state that the Official Committee of Talc Claimants ("TCC") is not a corporate entity.  The Committee consists of ten natural persons and Blue Cross and Blue Shield of Massachusetts ("BCBSMA").  BCBSMA is composed of Blue Cross and Blue Shield of Massachusetts, Inc. ("BCBS Inc.") and Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc. ("HMO Inc."). BCBS Inc. and HMO Inc. are not-for-profit medical services corporations organized as charitable organizations. BCBS Inc. is organized under M.G.L. cc. 176A and 176B, and HMO Inc. is organized under M.G.L. c. 180. BCBS Inc. is the parent of HMO Inc.

Counsel for Appellant further state that Johnson & Johnson is the parent company of Debtor-Appellee, LTL Management LLC. Johnson & Johnson is a publicly owned corporation with a financial interest in this litigation. Among other things, Johnson & Johnson asserts that it has indemnification rights against the Debtor and has obligations to the Debtor's parent company (Holdco) under a Support Agreement.

July 3, 2023                                       *Daniel M. Stolz*
                                                  Daniel M. Stolz

# TABLE OF CONTENTS

PRELIMINARY STATEMENT....................................................................1

JURISDICTION ....................................................................................7

STATEMENT OF ISSUES AND STANDARDS OF REVIEW.................8

STATEMENT OF THE CASE ..................................................................9

I.   Background of Talc Litigation ........................................................9

     A.   J&J's Tortious Conduct..........................................................9

     B.   J&J and Old JJCI Satisfy Talc Liabilities in the Ordinary Course ....................................................................................12

II.   J&J Orchestrates LTL's Creation and the LTL 1.0 Bankruptcy—Which the Third Circuit Ordered Dismissed For Lack of Good Faith ...........................................................................................13

III.   LTL Immediately Begins Taking Steps to Evade the Third Circuit's Decision ..........................................................................17

     A.   LTL's Faulty Attempts to Manufacture Financial Distress by Relinquishing Its Most Valuable Asset: Its Rights to the J&J "ATM" Under the 2021 Funding Agreement ................18

     B.   LTL's Faulty Attempts to Bolster Its Likelihood of Successful Reorganization By Entering "Plan Support Agreements" With Counsel Who Merely Promised to Recommend the Plan to Claimants......................................20

IV.   LTL Moves For A Preliminary Injunction, Which The Bankruptcy Court Grants In Part....................................................22

ARGUMENT ........................................................................................25

I.   The Bankruptcy Court Lacked Subject-Matter Jurisdiction to Enjoin Actions Against the Non-debtors.........................................25

     A.   The Bankruptcy Court Lacked "Core" Jurisdiction..............25

B.  The Bankruptcy Court Lacked "Related To" Jurisdiction. ..30

II.  The Bankruptcy Court Committed Legal Error In Extending the "Automatic" Stay to Non-debtors, Even Apart From the Absence of Jurisdiction ........................................................................ 42

III.  The Bankruptcy Court Erred in Entering a Preliminary Injunction Under Section 105(a), Even Assuming It Had Jurisdiction ...................................................................... 51

    A.  The Bankruptcy Court Applied an Incorrect Likelihood of Success Standard ................................................. 52

    B.  The Bankruptcy Court's Finding Of Irreparable Harm Contravenes the Third Circuit's Holding and Is Otherwise Legally Erroneous ................................................. 57

    C.  The Bankruptcy Court Erred in Failing to Recognize That the Talc Claimants Are Being Gravely Harmed By the Continued Deprivation of Their Right to Trial ..................... 60

    D.  The Bankruptcy Court Erred In Finding That the Public Interest Weighed in Favor of Suspending Talc Claimants' Rights to Trials And Appeals ................................. 63

CONCLUSION ........................................................................ 66

# <u>TABLE OF AUTHORITIES</u>

## Cases

*A.H. Robins Co., Inc., v. Piccinin,*
    *788 F.2d. 994 (4th Cir. 1986)*..........................................................45, 49

*Algemene Bank Nederland, N.V. v. Hallwood Indus., Inc.,*
    133 B.R. 176 (W.D. Pa. 1991) ...............................................................39

*Bader v. Johnson & Johnson*,
    86 Cal. App. 5th 1094 (Cal. Ct. App. 2022),
     *cert. denied* (Apr. 12, 2023) ...............................................................12

*Bouton v. Litton Industries, Inc.*,
    423 F.2d 643 (3d Cir. 1970) ..................................................................37

*Bradberry v. Carrier Corp.*,
    86 So. 3d 973 (Ala. 2011) .....................................................................44

*Carl v. Johnson & Johnson*,
    237 A.3d 308 (N.J. App. Div. 2020),
    *cert. denied*, 244 A.3d 270 (N.J. 2021).................................................12

*Chemetron Corp. v. Jones*,
    72 F.3d 341 (3d Cir.1995),
    *cert. denied*, 517 U.S. 1137 (1996) .......................................................9

*Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health &*
    *Hum. Servs.*,
    724 F.3d 377 (3d Cir. 2013) ..................................................................51

*Dunphy v. Ryan*,
    116 U.S. 491 (1886) ..............................................................................65

*Ferring Pharms., Inc. v. Watson Pharms., Inc.*,
    765 F.3d 205 (3d Cir. 2014) ..................................................................51

*FPSDA II, LLC v. Larin (In re FPSDA I, LLC)*,
    No. 10-75439, 2012 WL 6681794 (Bankr. E.D.N.Y. Dec. 21, 2012)..50

*Gold v. Johns-Manville Sales Corp.*,
   723 F.2d 1068 (3d Cir. 1983) ........................................................ 49, 61

*Holland v. Rosen*,
   895 F.3d 272 (3d Cir. 2018) .................................................... 51, 52, 56

*In re Aearo Technologies LLC*,
   642 B.R. 891 (Bankr. S.D. Ind. 2022) ......................................... 40, 46

*In re Aldan Indus., Inc.*,
   No. 00-10360DWS, 2000 WL 357719
   (Bankr. E.D. Pa. Apr. 3, 2000) ......................................................... 47

*In re Am. Film Techs., Inc.*,
   175 B.R. 847 (Bankr. D. Del. 1994) .................................................. 45

*In re Combustion Eng'g, Inc.*,
   391 F.3d 190 (3d Cir. 2004) ...................................................... passim

*In re Family Health Servs., Inc.*,
   105 B.R. 937 (Bankr. C.D. Cal. 1989) ............................................... 45

*In re Federal–Mogul Global, Inc.*,
   300 F.3d 368 (3d Cir. 2002) ....................................................... 31, 41

*In re Imerys Talc Am., Inc.*,
   No. 19-10289, ECF 5031, at 13 (Bankr. D. Del.) .............................. 46

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. &
   Prods. Litig.*,
   509 F. Supp. 3d 116 (D.N.J. 2020) .................................................... 11

*In re LTL Mgmt., LLC*,
   637 B.R. 396 (Bankr. D.N.J. 2022) ................................................ 9, 14

*In re Madera*,
   No. ADV 06-417, 2008 WL 447497 (E.D. Pa. Feb. 7, 2008) .............. 59

*In re Phila. Newspapers, LLC*,
   407 B.R. 606 (E.D. Pa. 2009) ............................................................ 24

*In re Resorts Int'l, Inc.*,
　372 F.3d 154 (3d Cir. 2004) ............................................................ 30

*In re Samsung Elecs. Co.*,
　2 F.4th 1371 (Fed. Cir. 2021).......................................................... 29

*In re Scarborough-St. James Corp.*,
　535 B.R. 60 (Bankr. D. Del. 2015) .................................................. 44

*In re SGL Carbon Corp.*,
　200 F.3d at 154 (3rd Cir. 1999) ........................................................ 6

*In re Siciliano*,
　13 F.3d 748 (3d Cir. 1994) ................................................................. 8

*In re Union Tr. Philadelphia, LLC*,
　460 B.R. 644 (E.D. Pa. 2011) .......................................................... 53

*Ingham v. Johnson & Johnson*,
　608 S.W.3d 663 (Mo. Ct. App. 2020),
　*cert. denied*, 141 S. Ct. 2716 (2021) ......................................... 10, 12

*Johnson & Johnson Talcum Powder Cases*,
　249 Cal. Rptr. 3d 642 (Cal. Ct. App. 2019) ...................................... 12

*Johnson & Johnson v. Aetna Cas. & Sur. Co.*,
　285 N.J. Super. 575 (App. Div. 1995)............................................... 38

*Law v. Seigel*,
　571 U.S. 415 (2014) ......................................................................... 43

*Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*,
　562 F.3d 553 (3d Cir. 2009) ............................................................ 59

*LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint*
　(*In re LTL Mgmt., LLC*),
　　64 F.4th 84............................................................................ passim

*LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint*,
　(*In re LTL Mgmt. LLC*),
　638 B.R. 291 (Bankr. D.N.J. 2022)............................................. 16, 33

vii

*Madison Square Garden Corp. v. Braddock,*
   90 F.2d 924 (3d Cir. 1937) ........................................................... 52, 55

*Maritime Elec. Co. v. United Jersey Bank,*
   959 F.2d 1194 (3d Cir. 1991) ........................................... 43, 44, 48, 49

*Matter of Brennan,*
   198 B.R. 445 (D.N.J. 1996) ............................................................. 7, 9

*Mazurek v. Armstrong,*
   520 U.S. 968 (1997) .......................................................................... 52

*McCartney v. Integra Nat'l Bank N.,*
   106 F.3d 506 (3d Cir. 1997) .................................................. 42, 45, 47

*McTernan v. City of York, Penn.,*
   577 F.3d 521 (3d Cir. 2009) ............................................................. 60

*Mellon Bank, N.A. v. Metro Communications, Inc.,*
   945 F.2d 635 (3d Cir.1991),
   *cert. denied*, 503 U.S. 937 (1992) ..................................................... 9

*Millard v. Developmental Disabilities Inst., Inc.,*
   266 B.R. 42 (E.D.N.Y. 2001) ............................................................ 50

*Nken v. Holder,*
   556 U.S. 418 (2009) .......................................................................... 52

*Nken v. Holder,*
   556 U.S. 418 (2009) .......................................................................... 52

*NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc.*
   (*In re Integrated Telecom Express, Inc.*),
   384 F.3d 108, 119 (3d Cir. 2004) ....................................................... 6

*Nolan v. Boeing Co.,*
   919 F.2d 1058 (5th Cir. 1990) .......................................................... 29

*Pacor, Inc. v. Higgins,*
   743 F.2d 984 (3d Cir. 1984) ...................................................... 31, 41

*Patton v. Beardon,*
    8 F.3d 343 (6th Cir. 1993) ................................................................. 46

*Phar-Mor, Inc. v. Gen. Elec. Capital Corp.,*
    166 B.R. 57 (W.D. Pa. 1994) ............................................................. 49

*Singer Mgmt. Consultants, Inc. v. Milgram,*
    650 F.3d 223 (3d Cir. 2011) .............................................................. 52

*Singer Mgmt. Consultants, Inc. v. Milgram,*
    650 F.3d 223 (3d Cir. 2011) .............................................................. 52

*Solidus Networks, Inc. v. Excel Innovations, Inc.*
    *(In re Excel Innovations, Inc.),*
    502 F.3d 1086 (9th Cir. 2007) ........................................................... 53

*Stanford v. Foamex L.P.,*
    Civ. A. No. 07–4225, 2009 WL 1033607 (E.D. Pa. Apr.15, 2009) ..... 46

*Stoe v. Flaherty,*
    436 F.3d 209 (3d Cir. 2006) ......................................................... 25, 27

*Union Tr. Phila, LLC v. Singer Equip. Co. (In re Union Tr. Phila., LLC),*
    460 B.R. 644 (E.D. Pa. 2011) ............................................................ 53

*Univ. Med. Ctr. v. American Sterilizer Co. (In re Univ. Med. Ctr.),*
    82 B.R. 754 (Bankr. E.D. Pa. 1988) .................................................. 50

*W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.),*
    No. 01-01139 (JKF), 2004 WL 954772
    (Bankr. D. Del. Apr. 29, 2004) .......................................................... 46

*W.R. Grace & Co. v. Charkarian (In re W.R. Grace & Co.),*
    591 F.3d 164 (3d Cir. 2009) ................................................... 27, 31, 41

*Wade v. Rogala,*
    270 F.2d 280 (3d Cir. 1959) ......................................................... 25, 34

*Webb v. Phila. Gas Works (In re Webb),*
    38 B.R. 541, 545 (Bankr. E.D. Pa. 1984) .......................................... 59

*Wedgeworth v. Fibreboard Corp.*,
    706 F.2d 541 (5th Cir. 1983) ............................................................... 61

*Williford v. Armstrong World Indus.*,
    715 F.2d 124 (4th Cir. 1983) ........................................................ 43, 62

## Statutes

11 U.S.C. § 105 .......................................................................... passim

11 U.S.C. § 362 .......................................................................... passim

11 U.S.C. § 509 .............................................................................. 43

11 U.S.C. § 524 ......................................................................... 64, 65

11 U.S.C. § 541 .............................................................................. 48

11 U.S.C. § 1112 ............................................................................. 2

11 U.S.C. § 1126 ............................................................................ 64

28 U.S.C. § 157 ............................................................................... 7

28 U.S.C. § 158 ............................................................................... 8

28 U.S.C. § 1334 ....................................................................... 7, 46

28 U.S.C. § 1359 ............................................................................ 32

28 U.S.C.§ 1407 ............................................................................ 73

28 U.S.C. §1452 ............................................................................ 29

N.J.S.A. 14A:5–28 ........................................................................ 41

Tex. Bus. Orgs. Code Ann. § 10.001 ........................................... 1

## Rules

Fed. R. Bankr. P. 8001 .................................................................. 7

Fed. R. Bankr. P. 8002 .................................................................. 7

## <u>PRELIMINARY STATEMENT</u>

This is the second Potemkin-village bankruptcy orchestrated by Johnson & Johnson, Inc. ("J&J"). It created a subsidiary, Debtor-Appellee, LTL Management LLC ("LTL") under the Texas divisive merger statute, Tex. Bus. Orgs. Code Ann. §§ 10.001 *et seq*., as the first step of what is now referred to as a "Texas Two-Step." J&J sought to saddle LTL with J&J's own independent liability for personal injuries associated with its talcum powder products, such as Johnson's Baby Powder and Shower to Shower ("STS"). It then orchestrated LTL's initial bankruptcy filing on October 14, 2021, just 48 hours after LTL's creation. A key element of that strategy was to gain a litigation advantage over tens of thousands of grievously injured cancer victims, through an injunction halting talc actions against J&J and over 100 other highly solvent non-debtor entities, including some of the wealthiest corporations in America. J&J, for example, is "one of the top 10 companies in the United States by market value[,]"[1] with (as of the October 2021 filing) a market capitalization of approximately $450 billion, roughly $30 billion in

---

[1] Jan. 28, 2022 Diaz Expert Report, at 660A.

annual earnings before interest, taxes, and amortization,[2] over $41 billion in cash, marketable securities, and credit lines, and a credit rating higher than that of the United States.[3]  Yet LTL sought to enjoin actions seeking to hold J&J directly liable for its independent wrongdoing.

The Official Committee of Talc Claimants in existence at the time (which largely overlaps with Appellant TCC), opposed LTL's requested injunctive relief and moved to dismiss LTL's bankruptcy filing for lack of good faith pursuant to 11 U.S.C. § 1112(b)(1).  By order of March 2, 2022, the bankruptcy court denied the motions to dismiss filed by the TCC and other parties, and by order of March 7, 2022, it granted the injunctive relief sought by J&J and LTL.  The court certified its orders for direct appeal to the Third Circuit.

The Third Circuit reversed, dismissed LTL's first bankruptcy ("LTL 1.0") for failure to satisfy the good faith requirement of the Bankruptcy Code, and vacated the injunctive relief.  *LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint* (*In re LTL Management, LLC*), 64 F.4th 84 (3d Cir. 2023).  Despite the Third

---

[2] Feb. 11, 2022 Kaplan Dep. Tr., at 766A.

[3] Jan. 28, 2022 Diaz Expert Report, at 659 A; *see* Jan. 28, 2022 Burian Expert Report, at 668A–681A.

Circuit's authoritative decision, LTL re-filed for bankruptcy ("LTL 2.0") less than 2 hours and 11 minutes after the bankruptcy court effectuated the Third Circuit's mandate by dismissing LTL 1.0. The bankruptcy court denied requests that it dismiss this abusive second filing *sua sponte*.

Instead, by bench order of April 20, 2023 (later incorporated into a written order of April 25, 2023 and supplemented by a written opinion of April 27, 2023), the bankruptcy court granted sweeping nationwide injunctive relief preventing thousands of cancer victims[4] from proceeding with trials and appeals against J&J and some 100 other non-debtor parties, including such wealthy companies as 7-Eleven, Inc., Albertsons Companies, Inc., Costco Wholesale Corporation, CVS Health Corporation, Duane Reade, Inc., Walgreens Co., and Walmart Inc.[5] Although the bankruptcy court's April 25 order expired by its original terms on June 15, 2023, the bankruptcy court subsequently extended that order through August 22, 2023.[6] At the time of this filing, the

---

[4] *See* Appendix A to Debtor's Complaint (Adv. Dkt. Nos. 1-1, 1-2) (listing over a ***thousand*** pages of court cases filed by claimants to be enjoined).

[5] *See* Appendix B to Debtor's Complaint (Adv. Dkt. No. 1-3).

[6] *See* June 13, 2023 Hearing Tr., at 738A:10–739A:4.

3

extension order has not yet been entered.  Once it is entered, the TCC intends to file a notice of appeal with respect to that order and, absent direct certification of that order to the Third Circuit, move to consolidate that appeal with the instant one.

The bankruptcy court's injunction against talc trials and appeals is legal error.  The court exceeded the jurisdictional limits of its authority and misinterpreted the relevant legal standards concerning its injunctive relief——the automatic stay provision of Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a), and Section 105(a) of the Code, 11 U.S.C. § 105(a), which authorizes bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

First, the bankruptcy court erred by crediting J&J's attempts to manufacture bankruptcy jurisdiction via orchestrated agreements, when as a matter of law parties cannot manufacture federal jurisdiction.

Second, the bankruptcy court erred by extending the automatic stay of Section 362(a) to non-debtors.  By its plain language, Section 362(a) applies only to a "debtor"——i.e., LTL——and not non-debtor entities like J&J.  In addition, the bankruptcy court erred by finding "unusual

4

circumstances" in this case based on circumstances that cannot qualify to extend the stay.

Third, the bankruptcy court applied incorrect legal standards in granting a preliminary injunction against talc trials and appeals under Section 105(a).  That provision requires a movant to satisfy the familiar standards for injunctive relief: reasonable probability of success, irreparable harm, and a showing that relief is warranted by the balance of the equities and the public interest.  Far from finding a reasonable likelihood LTL would succeed in reorganizing, the bankruptcy court acknowledged the opposite. The Court was "skeptical" LTL could succeed.[7]  It explained that LTL "[u]ndoubtedly" faces an "uphill battle" to show a good faith basis for proceeding in bankruptcy.[8]  The Court nonetheless granted LTL injunctive relief in favor of non-debtors, because it could not conclude "there is no ***possibility*** of a successful reorganization[.]"[9]  The "possibility of success" standard is a legally improper test for a preliminary injunction.

---

[7] *See* Apr. 27, 2023 Memorandum Opinion ("PI Op."), at 335A.

[8] *Id.*

[9] *Id.* (emphasis added).

5

The bankruptcy court also erred by holding that litigation outside of bankruptcy against solvent non-debtors constituted irreparable harm to LTL, by failing to give sufficient weight to the right to jury trial and claimants' entitlement to their long-delayed day in court, and by failing to recognize that granting LTL injunctive relief rewards bad-faith abuse of the bankruptcy system at the expense of injured victims.  Indeed, having created LTL as a separate company to wall it off from J&J and J&J affiliates in bankruptcy—putting LTL in bankruptcy but keeping other entities out—J&J is precluded from asking courts to ignore that separateness by extending LTL's stay to legally separate entities.

At bottom, the bankruptcy court failed in its duty to "patrol[]" the border "between accomplishing the objectives of rehabilitation and reorganization, and the use of these statutory provisions to destroy and undermine the legitimate rights and interests of those intended to benefit by this statutory policy." *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc.* (*In re Integrated Telecom Express, Inc.*), 384 F.3d 108, 119 (3d Cir. 2004)  (quoting *In re SGL Carbon Corp.*, 200 F.3d 154, 161 (3d Cir. 1999)).  This Court should safeguard the integrity of the bankruptcy system and permit talc victims to vindicate their rights in court against

the parties that gravely harmed them. The bankruptcy court's order should be vacated.

## **JURISDICTION**

The bankruptcy court had jurisdiction over the bankruptcy under 28 U.S.C. §§ 1334(a) and 157(a), but as explained below, lacked jurisdiction to issue the preliminary injunction.

This Court has jurisdiction over appeals from final judgments and orders of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a)(1) and Rule 8002 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). That jurisdiction extends to preliminary injunction orders. *See Matter of Brennan*, 198 B.R. 445, 448 (D.N.J. 1996). The bankruptcy court issued its ruling as a bench order on April 20, 2023.[10] It subsequently issued a written order on April 25, 2023.[11] On April 21, 2023, the TCC timely filed its notice of appeal pursuant to 28 U.S.C. § 158(a) and Federal Rule of Bankruptcy Procedure 8001(a). The TCC later amended that notice to reflect the bankruptcy court's subsequent issuance of a written order and opinion.[12]

---

[10] *See* Apr. 20, 2023 Hearing Tr., at 705 –731A.
[11] *See* Apr. 25, 2023 Order, at 279A–312A.
[12] *See* Amended Notice of Appeal and Statement of Election ("Amended Notice of Appeal"), at 1A–9A.

## STATEMENT OF ISSUES AND STANDARDS OF REVIEW

(1)   Whether the bankruptcy court erred in holding that it had subject-matter jurisdiction to enter its order.

(2)   Whether the bankruptcy court committed legal error in extending the Section 362(a) automatic stay to non-debtors and in finding that "unusual circumstances" warranted the extension.

(3)   Whether the bankruptcy court applied incorrect standards for extending injunctive relief under Section 105(a) and otherwise erred in holding that its injunction was proper under the factors governing injunctive relief: likelihood of success, irreparable harm, harm to the nonmoving party, and public interest.

This Court, sitting as an appellate tribunal, applies a clearly erroneous standard to review the bankruptcy court's factual findings and a *de novo* standard to review its conclusions of law.  *See In re Siciliano*, 13 F.3d 748, 750 (3d Cir. 1994).  Mixed questions of fact and law require a mixed standard of review, under which the court reviews findings of historical or narrative fact for clear error but exercises plenary review over the bankruptcy court's "choice and interpretation of legal precepts and its application of those precepts to the historical facts."  *Mellon Bank,*

8

*N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 642 (3d Cir. 1991), *cert. denied*, 503 U.S. 937 (1992); *see also Chemetron Corp. v. Jones*, 72 F.3d 341, 345 (3d Cir.1995), *cert. denied*, 517 U.S. 1137 (1996).  Issuance of a preliminary injunction is reviewed for abuse of discretion.  *Brennan*, 198 B.R. at 448.

## STATEMENT OF THE CASE

## I.   Background of Talc Litigation

### A.   J&J's Tortious Conduct

J&J manufactured talc-based Johnson's Baby Powder until 1979. Since then, various J&J subsidiaries and ultimately Johnson & Johnson Consumer Inc. ("Old JJCI") produced it.  *In re LTL Mgmt., LLC*, 637 B.R. 396, 400–01 (Bankr. D.N.J. 2022).   Even after 1979,  J&J retained responsibility for health-and-safety policy decisions for Baby Powder:  It had the power to require product warnings or stop selling talc products, but failed to do so.[13]   Instead, in 2018 and 2019, J&J, including its CEO Alex Gorsky, issued public statements assuring consumers that its talc products were safe.[14]

---

[13]  Hopkins Dep. Tr., at 750A:22–751A:10, 753A:1–12; *Olson v. J&J*, No. 190328/2017, (Sup. Ct. of N.Y.), May 3, 2019 Hearing Tr., at 757A–759A.

[14] Email dated Dec. 17, 2018, at 834A–835A; J&J Memo to House Subcommittee

But J&J long knew its talc-based products were not safe. In December 2018, Health Canada identified a causal connection between genital exposure to talc and ovarian cancer.[15] In October 2019, the FDA detected asbestos—which is the only known cause of mesothelioma—in J&J's Baby Powder.[16] From November 2019 to October 13, 2021 (one day before LTL's first bankruptcy), seven mesothelioma plaintiffs won trials against J&J (as well as Old JJCI).[17] Juries also found J&J (as well as Old JJCI) liable for ovarian cancer caused by their talc products.[18] *E.g.*, *Ingham v. Johnson & Johnson*, 608 S.W.3d 663, 724–25 (Mo. Ct. App. 2020), *cert. denied*, 141 S. Ct. 2716 (2021). Thus, J&J has been held directly and independently liable in talc litigation.

Although J&J had long known talc could cause cancer, it did not stop selling talc-based Baby Powder in the U.S. and Canada until May

---

on Economic and Consumer Policy, Mar. 11, 2019, at 836A–839A; Excerpt from CNBC Website, "J&J CEO denies reports about asbestos in baby powder," at 840A–843A.

[15] Dec. 2018 Draft Screening Assessment on Talc – Health Canada, at 844A – 858A; Apr. 2021 Draft Screening Assessment on Talc – Health Canada, at 859A – 869A.

[16] Feb. 16, 2022 Hearing Tr., at 702A:11–19.

[17] *Id.*, at 703A–704A; *see also* Oct. 14, 2021 LTL Informational Brief, at 395A.

[18] Oct. 14, 2021 First Day Declaration of John Kim ("Kim Decl. I"), at 488A–489A.

2020.[19]  Today, J&J sells only baby powder made of cornstarch in the U.S. and Canada, a product it has sold for decades. [20]   By the time LTL filed its first bankruptcy petition, J&J and Old JJCI faced more than 38,000 ovarian cancer claims—about 35,000 in a Multi-District Litigation proceeding ("MDL") in the District of New Jersey, roughly 2,200 claims consolidated in California and New Jersey state courts, and another 1,100 claims in other state courts.[21]   J&J and Old JJCI also faced more than 400 mesothelioma cases, with more than 250 coordinated in New Jersey state court.[22]

J&J disputes the causal link between its talc-related products and cancer.   After hearing extensive evidence, however, the MDL court admitted (with limited exceptions) expert testimony establishing a causal relationship between talc products and epithelial ovarian cancer.  *See In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig.*, 509 F. Supp. 3d 116, 198 (D.N.J. 2020).  Trial and appellate

---

[19] *Barden v. Brenntag North America*, No. MID-L-0932-17AS (Sup. Ct. N.J.), July 22, 2019 Hearing Tr., at 744A:20–745A:13; Kim Decl. I, at 487A–488A.

[20] *In re LAOSD Asbestos Cases*, No. BC656425, (Sup. Ct CA, County of LA), Apr. 11, 2018 Hearing Tr. at 763A:1–22.

[21] Oct. 14, 2021 LTL Informational Brief, at 470A.

[22] *Id.*, at 471A.

courts have repeatedly rejected J&J's position on talc's safety. *See, e.g.*, *Ingham*, 608 S.W.3d at 718; *Bader v. Johnson & Johnson*, 86 Cal. App. 5th 1094, 1129 (Cal. Ct. App. 2022), *cert. denied* (Apr. 12, 2023); *Carl v. Johnson & Johnson*, 237 A.3d 308, 311 (N.J. Super. Ct. App. Div. 2020), *cert. denied*, 244 A.3d 270 (N.J. 2021); *Johnson & Johnson Talcum Powder Cases*, 249 Cal. Rptr. 3d 642, 676 (Cal. Ct. Sup. Ct. App. 2019).

### B.  J&J and Old JJCI Satisfy Talc Liabilities in the Ordinary Course

For years, J&J and Old JJCI satisfied talc and other liabilities in the ordinary course.   In May 2020, J&J told a bankruptcy court in a different talc liability case that it was "absurd" to suggest that "J&J may lack the financial wherewithal to meet its obligations[.]"[23]   J&J boasted being "one of the top 10 companies in the United States by market value[,]" which "can provide the claimants far greater protection than . . . the bankruptcy claims trust ever could."[24]

---

[23] Jan. 28, 2022 Diaz Expert Report, at 660A.

[24] *Id.*

II.  **J&J Orchestrates LTL's Creation and the LTL 1.0 Bankruptcy—Which the Third Circuit Ordered Dismissed For Lack of Good Faith**

On October 12, 2021, Old JJCI engaged in a series of transactions known as the "Texas Two-Step."  After a series of transactions, Old JJCI ceased to exist and two new companies—LTL and Johnson & Johnson Consumer Inc. ("New JJCI")—were formed.[25]  In the restructuring, all talc liabilities went to LTL (whose name stands for "Legacy Talc Litigation").[26]  Old JJCI's business assets, including a range of well-known brands (such as Tylenol, Band-Aid, and Neutrogena), together with non-talc liabilities (*e.g.*, trade claims), were assigned to New JJCI.[27] As LTL's chief legal officer explained, "the entity that was formerly JJCI and the entity that is the new JJCI were . . . virtually identical except for it no longer had the talc liabilities."[28]

LTL was given no operating business,[29] and LTL has no employees of its own. Its board, management, and professionals are paid by J&J and

---

[25] PI Op., at 316A.

[26] Feb. 11, 2022 Kaplan Dep. Tr., at 765A:7–13.

[27] Kim Decl. I, at 479A, 482A–484A; Feb. 15, 2022 Hearing Tr., at 697A.

[28] Feb. 15, 2022 Hearing Tr., at 698A.

[29] Jan. 28, 2022 Diaz Expert Report, at 665A–666A.

13

work (or worked) for J&J.[30]  LTL's office is "hoteling" space in a J&J building.[31]  As of the date on which its first bankruptcy petition was filed, LTL's bank account was not in its own name.[32]  LTL has no bonds, trade creditors, or pension liabilities.[33]  Its sole purpose is resolving talc liabilities, as planned and directed by J&J.

LTL was funded with a $6 million bank account and the rights to royalty streams valued at $367.1 million as of the petition date of LTL 1.0, as well as certain rights under J&J insurance policies.  *In re LTL Mgmt. LLC*, 637 B.R. 396, 402 (Bankr. D.N.J 2022).  J&J and New JJCI jointly and severally committed, under the 2021 Funding Agreement, to fund LTL's expenses (*i.e.*, to resolve talc liabilities assigned to LTL) inside or outside bankruptcy, up to the value of New JJCI, which LTL's counsel estimated at approximately $61.5 billion.  *Id.* at 423 n.27.

 On October 14, 2021, two days after LTL's creation, LTL's board met and authorized LTL to file for bankruptcy.[34]  A critical goal of the

---

[30] *Id.*, at 662A–666A.

[31] Feb. 14, 2022 Hearing Tr., at 693A.

[32] Debtor's Chapter 11 Monthly Operating Report, at 543A.

[33] Feb. 14, 2022 Hearing Tr., at 694A–695A; Feb. 1, 2022 Kim Dep. Tr., at 772A–773A; 775A.

[34] Oct. 14, 2021 Minutes of LTL Board of Managers, at 870A–876A.

bankruptcy was to freeze pending actions against J&J and other non-debtors, putting an end to jury trials.   J&J publicly announced that "all pending cosmetic talc cases will be stayed[,]" and that J&J and its affiliates "will continue to operate their business as usual[,]" before such relief had even been sought in the bankruptcy case.[35]   LTL told the Bankruptcy Court that, absent an injunction halting talc litigation against J&J and other non-debtors, "[t]he entire purpose of this" bankruptcy "would be thwarted[.]"[36]

Various parties, including the then-extant TCC, the U.S. Trustee, and an ad hoc committee of States, moved to dismiss for lack of good faith.   The bankruptcy court denied that motion and granted LTL's motion for sweeping injunctive relief halting litigation against hundreds of non-debtors, including J&J, its affiliates, numerous retailers (on the ground that J&J had granted them indemnity rights), and insurance companies (on the ground that LTL shared certain rights under J&J insurance policies).   *LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint, (In re LTL Mgmt. LLC)*, 638 B.R.

---

[35] J&J Oct. 19, 2021 Form 8-K, at 877A–879A.

[36] Debtor's Omnibus Reply, at 604A.

291 (Bankr. D.N.J. 2022).   The bankruptcy court noted an "unsettled" issue of subject-matter jurisdiction, *id.* at 301, but ruled that it could extend stay relief to non-debtors because "a lawsuit asserting talc related claims against" those non-debtors "is essentially a suit against Debtor," *id.* at 305, and because such suits would have an "undeniable impact on Debtor's estate," *id.* at 307.

On direct appeal from the bankruptcy court, the Third Circuit dismissed the first bankruptcy petition.   *In re LTL Mgmt.,* 64 F.4th 84. The Third Circuit found that LTL lacked the "financial distress" that is a prerequisite to bankruptcy because it had access to the $61.5 billion 2021 Funding Agreement, which functioned like an "ATM" to pay talc claims outside bankruptcy.   *Id.* at 109–110.   The Court of Appeals could not "see how its lack of financial distress could be overcome," because LTL had a "duty" to "access its payment assets," *id.* at 107, 110.   The surrender of the Funding Agreement, it further explained, would be subject to challenge as a fraudulent conveyance.   *Id.* at 109 n.18.   The Court warned such a bankruptcy filing, made "to change the forum of litigation" where the filer suffered "no financial distress raises . . . the specter of 'abuse which must be guarded against to protect the integrity

of the bankruptcy system.'" *Id.* at 110 n.19 (citation omitted).

Given its dismissal of the bankruptcy, the Third Circuit opined that its decision "annuls the litigation stay ordered by the Court and makes moot the need to decide that issue." *Id.* at 111. Nonetheless, the Third Circuit went out of its way to "note [that] certain pertinent factors lack full discussion" in the bankruptcy court's injunction decision. *Id.* at 108 n.16. The bankruptcy court, following the Third Circuit's mandate, dismissed the petition following remand.[37]

## III.  LTL Immediately Begins Taking Steps to Evade the Third Circuit's Decision

J&J and LTL, however, did not heed the Third Circuit's dismissal. Two hours and 11 minutes after the first bankruptcy was dismissed, LTL filed bankruptcy again. Having prevented tens of thousands of cancer victims from having their day in court for more than a year through an improper bankruptcy filing—during which hundreds of victims died, their cases frozen—J&J and LTL sought to evade the Third Circuit's decision by manufacturing financial distress and putting LTL into bankruptcy yet again.

---

[37] *See* Order Closing Adversary Proceeding, at 1223A–1224A.

A.   **LTL's Faulty Attempts to Manufacture Financial Distress by Relinquishing Its Most Valuable Asset: Its Rights to the J&J "ATM" Under the 2021 Funding Agreement**

In finding that LTL lacked the financial distress that is a pre-requisite to bankruptcy, the Third Circuit declared that the 2021 Funding Agreement functioned "not unlike an ATM[,]" providing the Debtor with a right to at least $61.5 billion in liquidity.   *In re LTL Mgmt.,* 64 F.4th at 109.   Beginning almost immediately after the Third Circuit announced its decision on January 30, 2023, and culminating during the two hours and eleven minutes that the Debtor, spent outside of bankruptcy on April 4, 2023, LTL—a subsidiary of and beholden to J&J—parted with that Funding Agreement, its most significant asset.

In its place, Debtor entered into a new funding agreement (the "2023 Funding Agreement").   That agreement has only one obligor:  New JJCI, which was renamed "Johnson & Johnson Holdco (NA) Inc." ("Holdco") in December 2022.[38]   J&J is not an obligor under the 2023 Funding Agreement.   Rather, only Holdco is obligated "to provide funding to the Debtor to pay for costs and expenses of the Debtor incurred in the

---

[38] Apr. 4, 2023 First Day Declaration of John Kim ("Kim Decl. II"), at 622A–623A.

18

normal course of its business[.]"[39]   As explained by LTL's chief legal officer, "J&J's balance sheet [is] not available to the Debtor[,]" and "Holdco's [formerly New JJCI's] assets . . .  no longer include the consumer health business."[40]

Debtor, Holdco and J&J also entered into a separate agreement (the "J&J Support Agreement"), which operates ***only*** in the chapter 11 case and "obligates J&J to provide the trust funding Holdco is required to provide under the 2023 Funding Agreement but only if Holdco fails to provide the funding."[41]   Accordingly, J&J's funding obligation under the J&J Support Agreement arises if, and only if, the Court confirms J&J's desired plan, and such plan becomes effective after all appeals are exhausted.   Non-debtor J&J thus asked the bankruptcy court to award it the benefit of a sweeping injunction, but declines to assume any current funding obligation to Debtor LTL.

---

[39] *Id.*, at 637A.

[40] *Id.*, at 639A.

[41] *Id.*, at 637A–638A.

19

**B.     LTL's Faulty Attempts to Bolster Its Likelihood of
         Successful Reorganization By Entering "Plan Support
         Agreements" With Counsel Who Merely Promised to
         Recommend the Plan to Claimants**

LTL filed this bankruptcy two hours and eleven minutes after the
dismissal of the LTL 1.0 as a bad faith filing.   LTL did not conduct any
genuine "business" during that brief period.   Instead, along with
surrendering its most valuable asset, it purportedly signed agreements
with various plaintiffs' lawyers prepared and agreed to during the
pendency of LTL 1.0.  Few of the lawyers had actual filed talc claims.
Nevertheless, LTL attempted to justify the second filing by telling the
bankruptcy court that the new filing is "supported by over **_60,000_**
**_claimants who have signed and delivered_** plan support
agreements[.]"[42]

The truth is that not a single claimant has signed a plan support
agreement.   LTL allegedly has "commitments from attorneys
representing those clients" to "recommend that their clients support the
agreement."[43] And LTL did nothing to verify the validity of those newly

---

[42] Apr. 11, 2023 Hearing Tr., at 735A (emphasis added).

[43] Apr. 15, 2023 Pulaski Dep. Tr., at 815A.

20

asserted but yet unfiled claims.[44]  J&J's outside counsel, who handled the recruiting effort, merely asked the plaintiff law firms—several of which had never filed a talc suit before[45]—for names, dates of birth, the last four digits of Social Security numbers, and self-described "claim type,"[46] even for claims that had never been compensable in the tort system prior to LTL's filing.  J&J did not ask for engagement letters, ask whether a complaint had been drafted, ask if the attorney had reviewed a pathology report, or verify exposure to Baby Powder.[47]  The U.S. Trustee's office, highly active in this case and familiar with the personal injury talc claims pool, has expressed doubt as to whether LTL's new claimant numbers could possibly be accurate.[48]  The bankruptcy court found that LTL has offered "only speculation" that the "new claims" purportedly supporting its plan are "viab[le]."[49]

---

[44] Apr. 14, 2023 Kim Dep. Tr. at, 777A–780A; 781A.

[45] Apr. 16, 2023 Murdica Dep. Tr., at 785A–791A, 792A.

[46] Apr. 16, 2023 Murdica Dep. Tr., at 798A–799A, 802A–812A.  *See also* Apr. 14, 2023 Kim Dep. Tr. at, 782A–783A.

[47] *Id.* at 793A–794A, 797A.

[48] Apr. 11, 2023 Hearing Tr., at 736A.

[49] PI Op., at 18.

21

## IV. <u>LTL Moves For A Preliminary Injunction, Which The Bankruptcy Court Grants In Part</u>

On April 4, 2023, the Debtor sought a temporary restraining order and a preliminary injunction to stay talc claims against an array of non-debtor "Protected Parties."[50] The Debtor asked the bankruptcy court to declare that the automatic stay extends to talc claims against those Protected Parties or, in the alternative, an injunction to prevent the continuation or commencement of talc claims against the Protected Parties.[51]

The next day, the bankruptcy court granted the temporary restraining order, enjoining defendants (for a period of 28 days) from "commencing or continuing to prosecute any Debtor Talc Claim against any of the Protected Parties on any theory of liability," which included "the pursuit of discovery from the Protected Parties" along with "any

---

[50] *See* Debtor's Motion An Order (I) Declaring That The Automatic Stay Applies Or Extends To Certain Actions Against Non-Debtors, (II) Preliminarily Enjoining Such Actions, And (III) Granting A Temporary Restraining Order Ex Parte Pending A Hearing On A Preliminary Injunction ("PI Motion"), at 46A–153A.

[51] *Id.*

collection activity[.]"[52]   The temporary restraining order was amended three more times.[53]

On April 17, 2023, the TCC filed an Objection to the Debtor's PI Motion ("Objection").  The TCC urged that the bankruptcy court lacked jurisdiction to enjoin actions against the non-debtors.  Even if the court did have jurisdiction, they urged, the automatic stay could not extend to non-debtors under Section 362(a).  And the Debtor did not meet its burden of showing entitlement to an injunction under Section 105(a).[54] Numerous other parties, including the U.S. Trustee and an ad hoc committee of States, also opposed the PI Motion.[55]

On April 18, 2023, the bankruptcy court held a hearing on the Debtor's PI Motion, during which it took testimony from Mr. Kim (LTL's chief legal officer), and heard argument from counsel.[56]

---

[52] *See* Ex Parte Temporary Restraining Order, at 159A–160A.

[53] *See* Amended Ex Parte Temporary Restraining Order, at 163A–172A; Second Amended Ex Parte Temporary Restraining Order, at 173A–182A; Third Amended Ex Parte Temporary Restraining Order, at 183A–192A.

[54] *See* Objection of the TCC to Debtor's Motion, at 209A–269A.

[55] *See, e.g.*, Objection of the United States Trustee to Debtor's Motion, at 193A–208A.

[56] *See* Apr. 18, 2023 Hearing Tr., at 880A–1222A.

On April 20, 2023, the bankruptcy court granted a preliminary injunction, reading its bench order into the record.[57] The bankruptcy court subsequently entered a written Order on April 25,[58] and issued its Opinion on April 27, further clarifying the bases and scope of the ruling.[59]

The bankruptcy court held that it possessed both "core" and "related to" jurisdiction against non-debtors.[60] Following the approach of *In re Phila. Newspapers, LLC*, 407 B.R. 606, 611 (E.D. Pa. 2009), the bankruptcy court invoked both Section 362(a) and Section 105(a) to enjoin the commencement or continuation of any trial or appeal against any of the Protected Parties identified in Appendix B to LTL's complaint.[61] The bankruptcy court noted that its preliminary injunction opinion in LTL 1.0 had identified an "identity of interests between the Protected Parties and the Debtor," found that "the parties share insurance coverage," and cited "potential indemnification obligations" based on a 1979 agreement between J&J and LTL's predecessor, Old

---

[57] Apr. 20, 2023 Hearing Tr. ("PI Ruling").

[58] Apr. 25, 2023 Order, at 279A–312A.

[59] *See generally* PI Op.

[60] *Id.*, at 320A–324A.

[61] *Id.*, at 321A–343A.

JJCI, in which Old JJCI allegedly assumed J&J's talc-related liabilities.[62]  The bankruptcy court incorporated its prior discussion by reference.[63]

On April 21, 2023, the TCC filed its Notice of Appeal of the PI Ruling,[64] which it later amended to incorporate the subsequently issued PI Order and Opinion.[65]

## **ARGUMENT**

I. **The Bankruptcy Court Lacked Subject-Matter Jurisdiction to Enjoin Actions Against the Non-debtors.**

LTL, as the party seeking injunctive relief, bears the burden of establishing subject-matter jurisdiction.  *Wade v. Rogala*, 270 F.2d 280, 284 (3d Cir. 1959).  It has failed to meet that burden.

A. **The Bankruptcy Court Lacked "Core" Jurisdiction.**

The bankruptcy court erred in holding that it possessed core jurisdiction.  "Core" jurisdiction encompasses "(1) cases 'under' title 11; (2) proceedings 'arising under' title 11; [and] (3) proceedings 'arising in' a

---

[62] *Id.*, at 324A.

[63] *Id.*, at 320A.

[64] *See* Notice of Appeal and Statement of Election, at 270A–278A.

[65] *See* Am. Notice of Appeal, at 1A–9A.

case under title 11." *Stoe v. Flaherty*, 436 F.3d 209, 216 (3d Cir. 2006). The bankruptcy court held that it possessed core jurisdiction because the automatic stay under Section 362(a) "is a substantive right under the Code[,]" and "[t]his Court certainly has jurisdiction to determine [Section] 362(a)'s applicability and scope in this bankruptcy case[.]"[66]   The bankruptcy court held that Section 362(a) was implicated because "the Talc Claims are, fundamentally, an attempt to liquidate and recover claims against the Debtor. . . . Debtor is responsible for any and all liabilities associated with the talc products by virtue of the 1979 Agreement and the 2021 Corporate Restructuring."[67]   In addition, the bankruptcy court noted that "the Protected Parties and Debtor share insurance policies[,]"[68] because the rights to recovery under insurance policies had been assigned to LTL as part of the Texas Two-Step.  That reasoning was error, for two separate reasons.

***First***, the question is not the statutory basis for requested bankruptcy relief.  It is the court's subject-matter jurisdiction over the

---

[66] PI Op., at 322A.

[67] *Id.*, at 325A.

[68] *Id.*

cases LTL seeks to enjoin.   The Third Circuit has explained that "[w]hether a proceeding is a 'core' proceeding that 'arises under' title 11 depends upon whether the Bankruptcy Code creates the cause of action or provides the substantive right invoked."  *Stoe*, 436 F.3d at 217.   In *Stoe*, the Third Circuit held there was no "core" jurisdiction over state-law claims removed to federal court under 28 U.S.C. §1452, because the underlying claims arose under state law, "not under the Bankruptcy Code."  *Id*.  "The Bankruptcy Code did not create [plaintiff] Stoe's cause of action."  *Id*.

*Stoe's* reasoning applies here.   Talc litigation against non-debtors arises under state law, not the Bankruptcy Code.   The bankruptcy court erroneously looked to the statutory provision LTL invoked to support its claim for stay relief—the fact that Section 362(a) is a bankruptcy provision—while ignoring the state-law basis for the state-court and federal MDL talc cases LTL sought to enjoin.

The Third Circuit rejected LTL's approach in *W.R. Grace & Co. v. Margaret Charkarian* (*In re W.R. Grace & Co.*), 591 F.3d 164 (3d Cir. 2009).   There, the debtor argued that "the Bankruptcy Court does not need related-to jurisdiction over the [state-court] Actions in order to

27

enjoin them, because the Court's jurisdiction over the adversary proceeding in [debtor's] Chapter 11 case is sufficient to provide it with a basis for expanding the [Section] 105(a) injunction" to non-debtors. *Id.* at 174. The Third Circuit rejected that argument because it would give "a bankruptcy court . . . power to enjoin any action, no matter how unrelated to the underlying bankruptcy it may be, so long as the injunction motion was filed in the adversary proceeding." *Id*.

The bankruptcy court made the same mistake here. Because the bankruptcy court did not have core jurisdiction over the state-law talc claims LTL seeks to enjoin, it did not have core jurisdiction to enjoin those actions.

***Second***, the bankruptcy court's reasoning was legally defective because it relied on fabricated transactions and connections.[69]   The "identity of interests between the Protected Parties and the Debtor" to which the court pointed were ***artificially manufactured*** by J&J.  LTL (i) never signed or assumed any indemnification agreements, insurance

---

[69] The TCC has filed a motion to dismiss LTL's second bankruptcy for lack of good faith, which is sub judice in the bankruptcy court, and expressly preserves the argument that LTL's lack of good faith in filing for bankruptcy constitutes an independent basis for vacating the PI Order.  The TCC expects those arguments to be handled in the pending motion to dismiss in the interest of judicial efficiency.

policies or other agreements, and (ii) never manufactured any Baby Powder. Rather, responsibility for any such indemnity obligations, shared insurance, or manufacturing liabilities was unilaterally allocated to LTL by J&J upon LTL's creation. This artificial creation of an "identity of interests" runs afoul of the foundational principle that parties may not construct a federal court's jurisdiction—especially that of a federal bankruptcy court, which possesses particularly limited jurisdiction.

Pursuant to 28 U.S.C. § 1359, a federal court lacks jurisdiction over any action "in which any party . . . has been improperly or collusively made or joined to invoke the jurisdiction of such court." Congress intended Section 1359 to guard against "litigants' attempts to manipulate jurisdiction" where none would otherwise exist. *See In re Samsung Elecs. Co.*, 2 F.4th 1371, 1377 (Fed. Cir. 2021). In other words, Section 1359 was "designed to prevent the litigation of claims in federal court by suitors who by sham, pretense, or other fiction acquire a spurious status that would allow them to invoke the limited jurisdiction of the federal courts." *See Nolan v. Boeing Co.*, 919 F.2d 1058, 1067 (5th Cir. 1990).

That rule applies with special force to bankruptcy courts, which have particularly limited and specialized jurisdiction.  The Third Circuit has held that debtors may not create federal bankruptcy jurisdiction over non-debtor third parties by way of plans of reorganization, consent, or otherwise.  *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 228–29 (3d Cir. 2004) *as amended* (Feb. 23 2005) (rejecting notion that non-debtors can manufacture subject-matter jurisdiction in bankruptcy by providing financial support to the debtor).  LTL's approach in this case would allow a debtor in bankruptcy to "write [its] own jurisdictional ticket," *In re Resorts Int'l, Inc.*, 372 F.3d 154, 161 (3d Cir. 2004), and indeed to write out such a "ticket" for a distinct, non-debtor entity.   Under LTL's approach, a debtor could manufacture "core" jurisdiction by accepting an assignment of liability on the courthouse steps, just prior to filing for bankruptcy.  There is no logical stopping point to this wholly improper expansion of bankruptcy jurisdiction, which would allow private parties to manipulate the bankruptcy system in an abusive manner.

### B.   <u>The Bankruptcy Court Lacked "Related To" Jurisdiction.</u>

The bankruptcy court also determined that "it ha[d] 'related to' jurisdiction" to enjoin third party actions because the "continued

30

litigation of talc claims against the Protected Parties—especially to the point of liquidation of a claim through trial—has a 'conceivable effect' on the bankruptcy estate[.]"[70]  This holding runs afoul of the Third Circuit's repeated decisions enforcing strict limits on "related to" bankruptcy jurisdiction in the context of suits against non-debtors.  "[R]elated to" jurisdiction requires a showing that the allegedly related lawsuit would "directly result in liability for the debtor."  *In re Combustion Eng'g.*, 391 F.3d at 231.  The test for related-to jurisdiction turns on "whether the allegedly related lawsuit would affect the bankruptcy pending without the intervention of yet another lawsuit."  *In re Federal–Mogul Global, Inc.*, 300 F.3d 368, 382 (3d Cir. 2002).

On four separate occasions—in *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984), *Federal–Mogul Global*, *Combustion Engineering*, and *In re W.R. Grace & Co.*, 591 F.3d 164—the Third Circuit has held that suits by asbestos claimants against non-debtors fall outside "related to" jurisdiction ***even where the suits would trigger indemnification claims against the debtor***.  In *Combustion Engineering*, for example, the Court of Appeals rejected the arguments (similar to those here) that

---

[70] PI Op., at 323A.

31

related-to jurisdiction could be established by a "unity of interest" between the debtor and non-debtors, based in part on "joint operations at single sites leading to the asbestos personal injury claims at issue" and "extensive financial inter-dependence." 391 F.3d at 230.

Third Circuit precedent forecloses any finding of related-to jurisdiction here. The bankruptcy court outlined three alleged effects on the estate from litigation against non-debtors: indemnification agreements, shared insurance, and verdicts outside this bankruptcy that may "certainly impact claims valuations, estimation, insurance, and mediation efforts inside this bankruptcy."[71] However, none of these reasons withstands scrutiny.

**<u>Shared Insurance</u>**: The Third Circuit has made clear that "shared insurance" cannot support an injunction absent a properly developed record and determinations regarding the applicability of the insurance policies (including whether such policies had been exhausted). In *In re Combustion Eng'g, Inc.*, the bankruptcy court, based on testimony that the debtor and third parties shared certain insurance coverage, "assumed that independent claims against [those third parties] would reduce the

---

[71] PI Op., at 323A.

insurance proceeds available to the estate." 391 F.3d at 232.  There, as here, "the Plan proponents contend[ed] that certain insurance policies [debtor] share[d] with [third parties] operate[d] as indemnification obligations, such that asbestos-related personal injury claims against [those third parties] would automatically deplete the insurance proceeds available to [the debtor] and thus reduce the assets available to the bankruptcy estate."  *Id.*  But the Third Circuit held that there were "insufficient findings of fact" to sustain jurisdiction on this ground because the bankruptcy court did not make "factual findings regarding the terms, scope or coverage of the allegedly shared insurance policies." *Id.* at 232–33.

Similarly, the bankruptcy court here failed to make any factual findings regarding the terms, scope, or coverage of the allegedly shared insurance policies.  Instead, the bankruptcy court ***acknowledged*** that those policies are "disputed, and no definitive determination has been made as to exhaustion."[72]  In fact, the Bankruptcy Court previously "[a]dmitted[]" that "the record in the instant case is not as sufficiently developed with respect to the insurance policies as in some of the other

---

[72] PI Op., at 325A.

cases that have extended the stay on this basis." *In re LTL Management, LLC*, 638 B.R. at 319.

LTL admits that "none of [the] insurers has acknowledged its coverage obligations, defended Old JJCI or J&J, paid the costs of defense, or indemnified J&J or Old JJCI for settlements or judgments."[73]  Because the carriers are currently disputing coverage, there is no actual present risk of depletion of available insurance proceeds.  Moreover, even if coverage exists, LTL has failed to show that the $2 billion policy limit is not already fully depleted by the $3.5 billion in talc judgments and settlements J&J paid in the five years before LTL filed for bankruptcy in LTL 1.0.

At bottom, plaintiff has not met its burden of establishing jurisdiction, *Wade*, 270 F.2d at 284, and the Court failed to develop the requisite record to find "related to" jurisdiction on the basis of shared insurance policies.

**<u>Indemnification Agreements</u>**:  Supposed indemnification obligations cannot support "related to" jurisdiction either.  To begin, the bankruptcy court relied on its PI order in LTL 1.0, declaring that

---

[73] Kim Decl. II, at 626A.

"[n]othing presented . . . in the Third Circuit's Opinion changes [its] analysis."[74]   But the Third Circuit, while ruling on other grounds, explained precisely why the analysis in LTL 1.0 was insufficient.  It went out of its way to "note [that] certain pertinent factors lack full discussion." *In re LTL Mgmt.*, 64 F.4th at 108 n.16.  There, as here, the bankruptcy court invoked indemnification obligations under the 1979 Agreement. But the Third Circuit opined that "it is not obvious LTL must indemnify J&J for the latter's independent, post-1979 conduct that is the basis of a verdict rendered against it." *Id.*  "It is also not clear the indemnity should be read to reach punitive damage verdicts rendered against J&J for its own conduct. Additionally, the Court never discussed how it reached its conclusion that Old Consumer assumed responsibility from J&J for all claims relating to [STS]." *Id.*  That same analysis remains lacking here.

As the Third Circuit explained, the 1979 Agreement provided that LTL's predecessor would assume all "liabilities and obligations of every kind and description ***which are allocated on the books or records of J&J*** as pertaining to its BABY Division." *Id.* (emphasis in original).  Mr. John Kim, LTL's chief legal officer, admitted that, to identify the specific

---

[74] PI Op., at 324A.

35

"liabilities and obligations . . . allocated on the books or records" of the Baby Products division that were assumed by LTL's predecessor, "you would have to look at books or records."[75]  Yet, as Mr. Kim further admitted, he "[has]n't looked."[76]  Susan Schirger-Ward, J&J's Senior Legal Records Coordinator, was never asked to look for the books or records.[77]  Neither Mr. Kim nor any other representative of the Debtor could identify "a single document where J&J has talc liabilities described in books" or records prior to execution of the 1979 Agreement.[78]

LTL has not produced any "books or records" as they existed for J&J's Baby Products Division as of the time of the 1979 Agreement, much less any evidence showing that any liabilities relating to present or future talc-related personal injury lawsuits were "allocated to the BABY Division on the books or records of Johnson & Johnson."  Mr. Kim admitted that "prior to January 1, 1979, there were no lawsuits claiming

---

[75] Nov. 4, 2021 Hearing Tr., at 682A.

[76] Oct. 31, 2021 Kim Dep. Tr., at 769A; Nov. 4, 2021 Hearing Tr., at 684A.

[77] Oct. 31, 2021 Schirger-Ward Dep. Tr., at 818A, 820A–821A, 822A–823A, 824A:16–825A:1, 827A:22 – 832A:4, 833 A:6–16; Nov. 4, 2021 Hearing Tr., at 682A:19–683A:8.

[78] Oct. 31, 2021 Kim Dep. Tr., at 769 A:6–11; 11-4-21 Nov. 4, 2021 Hearing Tr., at 684 A:6–687 A:7.

any personal injury arising from the alleged use of Johnson's Baby Powder and/or STS filed against any of the J&J companies."[79]  According to LTL, the first talc-related tort case of any kind was not filed against J&J until 1982.[80]  It is thus implausible to suggest that talc-related liabilities would have been "allocated on the books or records of J&J as pertaining to its BABY Division" in 1979.

The phrase "books or records" has a specific meaning in corporate law.  N.J.S.A. 14A:5–28 (describing "books," "records," "minutes" and other documents).  This is a far cry from the broad language in the assumption agreement in *Bouton v. Litton Indus., Inc.*, 423 F.2d 643 (3d Cir. 1970), on which the bankruptcy court relied.  That assumption agreement referred to "all liabilities and obligations . . . in respect of the contracts and commitments . . . and all other contracts and commitments entered into in the regular and ordinary course of . . . business at any time."  *Id.* at 649.

The Third Circuit also questioned whether LTL's predecessor could have assumed liability for J&J's STS talc product.  The 1979 Agreement

---

[79] Nov. 4, 2021 Hearing Tr., at 686A:4–11.

[80] Oct. 14, 2021 LTL Informational Brief, at 391A.

could not have encompassed liabilities arising from STS because, in 1979, STS was not manufactured or sold by the Baby Products division.[81] Rather, it was originally made by a division of J&J,[82] then by another wholly-owned subsidiary of J&J called Johnson and Johnson Personal Products Company.[83]   Because STS was not a part of J&J's Baby Products Division, the 1979 Agreement could not have transferred to LTL's predecessor any talc liabilities relating to STS.

In addition, the Third Circuit questioned whether LTL's predecessor could have assumed J&J's punitive damage liability, given New Jersey's public policy against indemnification for such damages. *Johnson & Johnson v. Aetna Cas. & Sur. Co.*, 667 A.2d 1087, 1089–93 (N.J. Sup. Ct. App. Div. 1995).

The bankruptcy court's failure to address those aspects of the "Third Circuit's Opinion," dooms its PI Order.[84]   Even if LTL were required to indemnify each and every one of the Protected Parties (something not found in evidence ***or even alleged by LTL***), the

---

[81] Nov. 4, 2021 Hearing Tr., at 690A:22–691A:12.

[82] *Id.*, at 689A:3–7.

[83] *Id.*, at 688A:22–689A:7.

[84] PI Op., at 324A.

bankruptcy court failed to explain why satisfaction of a plaintiff's legitimate tort claim by a third party would do anything more than reduce LTL's tort liability in exchange for a dollar-for-dollar increase in LTL's potential indemnification liability. In other words, such indemnification would have no net impact on the estate—except perhaps a beneficial one because an affiliated entity's indemnification liability would be a subordinate claim relative to the tort claims. *See* 11 U.S.C. § 509(c) ("The court shall subordinate to the claim of a creditor . . . an allowed claim . . . for reimbursement or contribution, of an entity that is liable with the debtor on . . . such creditor's claim, until such creditor's claim is paid in full . . . ."); *see e.g.*, *Algemene Bank Nederland, N.V. v. Hallwood Indus., Inc.*, 133 B.R. 176, 180 (W.D. Pa. 1991) ("If anything, allowance of judgment against Hallwood now might assist RAC's reorganization by replacing the claims of Algemene, a clearly hostile creditor, with Hallwood's claim for indemnification. RAC would be able to assert against Hallwood not only the defenses to the original claim by Algemene but also any additional defenses involved in the indemnification agreement between Hallwood and RAC.").

In addition, according to LTL itself, the Funding Agreement ensures that any talc judgment against J&J could not have an adverse effect on LTL's reorganization. If J&J were to tender an adverse talc judgment to LTL, LTL would simply tender that liability to Holdco under the Funding Agreement, avoiding any disruption of the reorganization. In the *Aearo* bankruptcy, a bankruptcy court faced with a funding agreement found a lack of subject-matter jurisdiction and denied stay relief for precisely that reason. *See In re Aearo Techs LLC*, 642 B.R. 891, 910 (Bankr. S.D. Ind. 2022) (considering funding agreement, "the Court cannot conclude that continuation of the Pending Actions will affect the amount of property for distribution or the allocation of property among creditors").

**No effect on Debtor's estate:** The bankruptcy court's third basis for finding "related to" jurisdiction—the risk of verdicts having an "impact" on the valuation or estimate of claims[85]—turns the Third Circuit's decision on its head.

The Third Circuit demanded proof of "immediate" and "imminent" distress. *In re LTL Mgmt.*, 64 F.4th at 102, 108. It held that, "[a]t best,"

---

[85] PI Op., at 323A.

LTL's petition "was premature[.]"  *Id.* at 109.  In "the context of a mass tort bankruptcy," it observed, a "longer history of litigation outside of bankruptcy may provide a court with better guideposts when" estimating claims and thus "fairly compensating claimants with wide-ranging degrees of exposure and injury."  *Id.*  It would be perverse to issue an injunction to prevent the very litigation the Third Circuit invoked as a compelling reason to ***dismiss*** the bankruptcy case as premature.

Moreover, LTL would be a non-party to any talc lawsuits against non-debtors and could not be precluded from later relitigating any issue. *See, e.g., In re W.R. Grace*, 591 F.3d at 172 (debtor "will not be bound by any judgment against the third party in question"); *Pacor,* 743 F.2d at 995 ("Since Manville is not a party to the Higgins-Pacor action, it could not be bound by res judicata or collateral estoppel").  LTL's liability could not be established without a separate proceeding against LTL, which the Third Circuit has identified as a feature negating the existence of related-to jurisdiction.  *In re Federal–Mogul Global, Inc.*, 300 F.3d at 382.  In any event, there are already multiple talc judgments against J&J, and so any speculative collateral estoppel impacts on LTL from such judgments would occur regardless of the bankruptcy court's injunctive relief.

The bankruptcy court's lack of jurisdiction under 28 U.S.C. § 1334(b) stay or enjoin the asbestos litigation against non-debtors itself compels reversal; this Court need go no further.

## II. The Bankruptcy Court Committed Legal Error In Extending the "Automatic" Stay to Non-debtors, Even Apart From the Absence of Jurisdiction

The bankruptcy court erred in holding that 11 U.S.C. § 362(a) allowed it to enjoin claims against non-debtor affiliates, insurers, and retail distributors of the Debtor.  On its face, a Section 362(a) automatic stay applies only to the *debtor*.  Section 362(a) of the Bankruptcy Code provides in pertinent part:

> [A] petition filed under section 301, 302, or 303 of this title . . . operates as a stay, applicable to all entities, of—
>
> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
>
> *        *        *
>
> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate . . . .

11 U.S.C. § 362(a)(1), (3).

"Although the scope of the automatic stay is broad, the clear language of section 362(a)[1] stays actions only against a 'debtor.'" *McCartney v. Integra Nat'l Bank N.*, 106 F.3d 506, 509–510 (3d Cir. 1997) (quoting *Maritime Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1204 (3d Cir. 1991)). "As a consequence, '[i]t is universally acknowledged that an automatic stay of proceedings accorded by [Section] 362 may not be invoked by entities such as sureties, guarantors, co-obligors, or others with a similar legal or factual nexus to the . . . debtor.'" *Id.* (quotations and citations omitted); *see also, e.g.*, *Williford v. Armstrong World Indus. Inc.*, 715 F.2d 124, 126 (4th Cir. 1983) (explaining that the relief afforded by Chapter 11's automatic stay "belongs exclusively to the 'debtor' in bankruptcy").

Similarly, by its plain words, Section 362(a)(3) protects only property in which a "debtor" had an interest as of the commencement of the bankruptcy case—whether the debtor's property was in the possession of the debtor or a third party. *See* 11 U.S.C. § 362(a)(3) (protecting estate property); 11 U.S.C. § 541(a)(1) (defining estate property to include all pre-petition interests of the debtor "wherever located and by whomever held"). As already noted, LTL's allegations

43

regarding shared insurance policies provide no basis for its suggestion that litigation against non-debtors would somehow constitute an "act to obtain possession of property of the estate" or "to exercise control over property of the estate." *See* Part I-B, *supra*.  As in *Aearo*, the funding agreement provides a further reason that shared insurance does not trigger Section 362(a)(3) in this case. 642 B.R. at 907.

The Supreme Court has made clear that bankruptcy courts may not extend statutes beyond their plain language even for purportedly laudable policy preferences.  *Law v. Seigel*, 571 U.S. 415, 427–28 (2014). Strictly construing Section 362(a) as limited to debtors, consistent with its text, ensures that it remains a shield for the debtor, not a sword for non-debtors.  The purpose of the automatic stay, which is to give debtors "a breathing spell," *Maritime Elec.*, 959 F.2d at 1204, has led courts to universally acknowledge that "the stay is a shield, not a sword."  *In re Scarborough-St. James Corp.*, 535 B.R. 60, 67, 70 (Bankr. D. Del. 2015) (noting, that "the stay is a shield, not a sword that should help the debtor deal with his bankruptcy for the benefit of himself and his creditors," and concluding that a debtor's use of the automatic stay to gain a litigation advantage justified lifting the automatic stay afforded by Section 362(a)).

44

Here, LTL seeks to convert the stay from a shield for the debtor into a sword to be wielded by its highly solvent, non-debtor affiliates. "Extending the stay to protect solvent co-defendants would not advance either of the purposes underlying the automatic stay." *Bradberry v. Carrier Corp.*, 86 So. 3d 973, 983 (Ala. 2011).

The bankruptcy court relied on the Third Circuit's decision in *McCartney* to extend the automatic stay to non-debtors under Section 362(a).[86] But *McCartney* did not involve a motion to extend the automatic stay to a non-debtor at all. In *McCartney*, the court excused failure to bring an otherwise mandatory suit because the plaintiff "would have been required" by state law "to name [the debtor] as a respondent" as a condition of suing third parties. 106 F.3d at 511–12.[87] The potential suit *McCartney* discussed thus ***had*** to be against the debtor by virtue of state

---

[86] PI Op., at 326A.

[87] The Third Circuit refused to allow the debtor to escape a lawful obligation through the artifice of a related entity. 106 F.3d at 510–11. Concurring in the judgment only, Judge Stapleton presciently observed that allowing unusual circumstances to support an exception to Section 362's plain text, "while it makes no difference here, is likely to lead to mischief in the context of other cases." *Id.* at 513 (Stapleton, J., concurring). Here, the Debtor seeks precisely such mischief, attempting to use the automatic stay as a sword to gain a litigation advantage for its highly solvent corporate parent.

law. By contrast, the tort suits here are against joint tortfeasors and defendants (like J&J) with independent liability.

Moreover, *McCartney* addressed Sections 362(a) and 105(a) together, invoking Section 105(a) cases—not Section 362(a) cases—to justify "'extend[ing] the stay to nondebtor defendants.'" *McCartney*, 106 F.3d at 510 (quoting *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1994)) (citing *In re Am. Film Techs., Inc.*, 175 B.R. 847 (Bankr. D. Del. 1994); *In re Family Health Servs., Inc.*, 105 B.R. 937 (Bankr. C.D. Cal. 1989)). "The courts cited by *McCartney* . . . relied on 11 U.S.C. § 105(a), not [Section] 362(a), to enjoin the actions against the non-bankrupt parties." *Stanford v. Foamex L.P.*, Civ. A. No. 07–4225, 2009 WL 1033607, at *1 n. 7 (E.D. Pa. Apr.15, 2009). *See also Patton v. Beardon*, 8 F.3d 343, 349 (6th Cir. 1993) ("such extensions [of the stay], although referred to as extensions of the automatic stay, were in fact injunctions issued by the bankruptcy court"). Courts have rejected efforts to construe *McCartney* as extending Section 362(a) to non-debtors in contravention of its text.[88]

---

[88] *See In re Imerys Talc Am., Inc.*, No. 19-10289, ECF No. 5031, at 13 (Bankr. D. Del.) ("*McCartney* . . . is consistent with the view that the automatic stay . . . only applies to litigation against a debtor[.]"); *see also In re Aearo Techs*, 642 B.R.

Even if the automatic stay of Section 362(a) could be extended to non-debtors in unusual circumstances, this case is not an appropriate situation for doing so.  The "unusual circumstances" exception is intended to be narrow and is reserved only for "extreme" circumstances.  *See, e.g., W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*, No. 01-01139 (JKF), 2004 WL 954772, at *2 (Bankr. D. Del. Apr. 29, 2004); *In re Aldan Indus., Inc.*, No. 00-10360DWS, 2000 WL 357719, at *4 (Bankr. E.D. Pa. Apr. 3, 2000) (characterizing it as "a narrow exception to the prohibition against extending the protection of the automatic stay").

This case involves a requested extension of the automatic stay to solvent third parties with independent liability to creditors.  Nothing in *McCartney* suggests that "unusual circumstances" may apply in such a situation.  Quite the opposite:  the *McCartney* Court observed that "it is universally acknowledged that an automatic stay of proceedings accorded by [Section] 362 may not be invoked by entities such as sureties, guarantors, co-obligors, or others with a similar legal or factual nexus to the . . . debtor."  106 F.3d at 509–10 (citations and quotations omitted).

at 905, appeal pending (invoking Section 105(a) rather than Section 362(a) and denying stay relief against non-debtors).

47

And yet LTL's entire justification for extending the stay to solvent third parties is that resolution of similar litigation allegedly could have a negative impact on LTL's ability to reorganize.  That simply cannot be the test.

Extending the automatic stay to actions against non-debtors with independent liability, based on an alleged negative impact on a debtor's ability to reorganize, would create an unworkable standard.  As Judge Wood of the Seventh Circuit recently observed in the *Aearo* oral argument (on a similar issue), the stay is automatic.[89]  It was written to apply upon the filing of a petition, without the need for any further order by a bankruptcy court, and "irrespective of whether the parties to the proceedings stayed are aware that a petition has been filed." *Maritime Elec. Co.*, 959 F.2d at 1204.  If Debtor's expansive view of Section 362 is allowed to stand, any court overseeing any litigation between non-debtor third parties could be called upon to determine, after the fact, whether that litigation has sufficient impact on a particular debtor's reorganization effort and therefore ***must*** be stayed under Section 362.

---

[89] Apr. 4, 2023 Hearing Tr. (*In re: Aero Technologies, LLC et al.*), at 733A:10–19.

Congress could not possibly have intended the automatic stay to have such uncertain (and highly fact-dependent) breadth.

None of the bankruptcy court's attempts to expand Section 362 has merit. The bankruptcy court relied on its prior PI order but failed to address the Third Circuit's criticisms in footnote 16 of its opinion. The bankruptcy court's finding of "identity of interest" fails to withstand scrutiny. As in *Aearo*, the debtor contends that the funding agreement will pay creditors in full, eliminating any impact on the estate from continued litigation. The bankruptcy court's finding that talc claims against LTL and non-debtors have a common nexus of fact and law is also insufficient. Indeed, that is precisely what the Third Circuit has held **cannot be the basis** for extending the stay to non-debtors even if they are co-defendants: "[T]he automatic stay is not available to non-bankrupt co-defendants of a debtor even if they are in a similar legal or factual nexus with the debtor." *Maritime Elec.*, 959 F.2d at 1205.

Moreover, even courts applying an "unusual circumstances" standard have recognized that a stay "would clearly not extend" to a co-defendant or third-party defendant who "was independently liable as, for example, where the debtor and another are joint tort feasors or where the

non-debtor's liability rests upon his own breach of duty." *A.H. Robins, Co. v. Piccinon,* 788 F.2d 994, 999 (4th Cir. 1986) (citation omitted); *see also Gold v. Johns-Manville Sales Corp.*, 723 F.2d 1068, 1076 (3d Cir. 1983) (upholding denial of a stay to co-defendants after the Johns-Manville defendants filed for bankruptcy, explaining that the suits could proceed because "the Chapter 11 debtors are potential joint tortfeasors"); *Phar-Mor, Inc. v. Gen. Elec. Capital Corp. (In re Phar-Mor, Inc. Sec. Litig.)*, 166 B.R. 57, 62 (W.D. Pa. 1994) (denying to apply the stay to independently liable third parties); *accord In re Combustion Eng'g*, 391 F.3d at 234 (holding injunctive relief could not  extend to "independent non-derivative claims against non-debtor third parties," because it "would  improperly extend bankruptcy relief to non-debtors" and "would jeopardize the interests of future . . . claimants" against the non-debtors).

The relief sought by LTL should be available, if at all, only upon a clear and convincing showing of an "extraordinary set of circumstances." *Millard v. Developmental Disabilities Inst., Inc.*, 266 B.R. 42, 44 (E.D.N.Y. 2001); *see also, e.g.*, *FPSDA II, LLC v. Larin (In re FPSDA I, LLC)*, No. 10-75439, 2012 WL 6681794, at *8 (Bankr. E.D.N.Y. Dec. 21, 2012), *as corrected* (Dec. 26, 2012) ("[E]xtensions of the stay to protect

non-debtor parties are the exception, not the rule, and are generally not favored. Thus, the movant must show by 'clear and convincing evidence' that extension of the stay is warranted."); *Univ. Med. Ctr. v. Am. Sterilizer Co. (In re Univ. Med. Ctr.)*, 82 B.R. 754, 757 (Bankr. E.D. Pa. 1988) (noting that "invocation of [Section] 105(a) must be reserved for a truly 'extraordinary set of circumstances'"). Nothing in the bankruptcy court's threadbare reasoning (or the reasoning it incorporated by reference from its LTL 1.0 preliminary injunction decision) comes close to meeting this standard.

## III.   The Bankruptcy Court Erred in Entering a Preliminary Injunction Under Section 105(a), Even Assuming It Had Jurisdiction.

The bankruptcy court's reliance on Section 105(a) was also error. Although the bankruptcy court correctly transcribed the preliminary injunction standards in a broad sense—likelihood of success, irreparable harm, harm to the nonmoving party, and public interest—the Court failed to accept that the "movant bears the burden" of establishing that "these four factors weigh in favor of granting the injunction," *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014), and that the "first two factors are prerequisites for a movant to prevail,"

51

*Holland v. Rosen*, 895 F.3d 272, 286 (3d Cir. 2018).  As explained below, the court's analysis of each factor is fatally flawed.

### A.    The Bankruptcy Court Applied an Incorrect Likelihood of Success Standard

The Bankruptcy Court held that, "[t]o demonstrate a reasonable likelihood of success, a movant need only show the prospect or possibility that he or she will succeed[.]"[90]  In support, the bankruptcy court cites only one authority:  a dissent in a non-bankruptcy case.[91]

That was error:  Mere "possibility" of success is not the standard. It is an extraordinarily low bar ill-befitting the "extraordinary and drastic remedy" of a preliminary injunction, which "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  A preliminary injunction is inappropriate "unless the movant, by a clear showing, carries the burden of persuasion." *Holland*, 895 F.3d at 285–86.  A clear showing is a heavy burden.  As the Third Circuit has observed, "[i]t has been well stated that upon an application for a preliminary injunction to

---

[90] PI Op., at 328A.

[91] *Id.* (citing *Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health & Hum. Servs.*, 724 F.3d 377, 399 (3d Cir. 2013)  (Jordan, J., dissenting)).

doubt is to deny." *Madison Square Garden Corp. v. Braddock*, 90 F.2d 924, 927 (3d Cir. 1937).

Consequently, to obtain a preliminary injunction, the movant needs "to show a ***likelihood*** of success on the merits (that is, a reasonable chance, or probability, of winning) to be granted relief." *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011). "It is not enough that the chance of success on the merits be 'better than negligible.'" *Nken v. Holder*, 556 U.S. 418, 434 (2009). Critically, **"*more than a mere 'possibility' of relief is required.*"** *Id.* (quoting appellant's concession with approval). The Bankruptcy Court committed reversible error in concluding that the "debtor need only show the ***possibility*** that it will succeed,"[92] and in holding that the "***possibility*** of a successful reorganization," *id.* at 23, was sufficient.

Under the correct "reasonable probability" standard, LTL did not carry its burden. "In the bankruptcy context, reasonable likelihood of success is equivalent to the debtor's ability to successfully reorganize." *Union Tr. Phila, LLC v. Singer Equip. Co.* (*In re Union Tr. Phila., LLC)*, 460 B.R. 644, 660 (E.D. Pa. 2011). Accordingly, "a debtor seeking to stay

---

[92] PI Op., at 328A.

an action against a non-debtor must show a reasonable likelihood of a successful reorganization." *Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.)*, 502 F.3d 1086, 1095 (9th Cir. 2007).

Far from finding a reasonable likelihood LTL would succeed in reorganizing, the bankruptcy court acknowledged the opposite. The Court was "skeptical" LTL could succeed.[93] It explained that LTL "[u]ndoubtedly" faces an "uphill battle" to show a good faith basis for proceeding in bankruptcy. *Id.* The bankruptcy court observed that LTL's claim of financial distress "certainly appears to be manufactured by the Debtor, Holdco, and J&J in direct response to the Third Circuit's ruling." *Id.* at 18. These actions demonstrate ***bad*** faith—not good faith. Indeed, the bankruptcy court left the door open to finding that a fraudulent transfer had occurred, *id.* at 19, as well as dismissal for absence of good faith, *id.* at 21.[94] Each of those findings precludes the issuance of an injunction under Section 105(a) on its own. Cumulatively, they unequivocally foreclose any reasonable possibility of success.

---

[93] PI Op., at 335A.

[94] *See also* Apr. 20, 2023 Hearing Tr., at 711A:22–24 ("Does the manner in which the transactions were undertaken give rise to an independent bas[i]s for finding bad faith? Possibly.").

The U.S. Trustee, for its part, has described LTL's reorganization efforts as "[f]utile."[95]  According to the U.S. Trustee, "LTL surrendered its most valuable asset" for "apparently no consideration," "replacing it with an instrument far less valuable," in a transaction that could be "'the largest fraudulent conveyance in the history of the United States'"—all "to circumvent the Third Circuit's ruling."[96]  LTL is a shell manufactured for bankruptcy, with no genuine business operations, no employees, no trade creditors, and no valid reorganization purpose.

The bankruptcy court noted that the Debtor "has come to this bankruptcy court alleging that the plan it intends to file will have the support of nearly 60,000" claimants.[97]  The bankruptcy court then conceded that "creditor support is not guaranteed," but excused this shortcoming by repeating the incorrect legal assertion that "a debtor need only show the possibility that it will succeed." *Id.*  Application of that incorrect standard warrants reversal.  And the bankruptcy court found it "uncertain whether these new claims are supportable" with

---

[95] Objection of the United States Trustee to Debtor's Motion, at 193A–202A.

[96] *Id.* at 202A–203A.

[97] PI Op., at 328A.

"only speculation" supporting the parties' contentions as to their "viability." *Id.* at 18.  But the rule for preliminary injunctions is that "to doubt is to deny." *Madison Square Garden*, 90 F.2d at 927.

Even assuming 60,000 claimants with valid claims willing to vote in support of the Debtor's plan, that is not enough.  Bankruptcy Code Section 1126(c) conditions approval of a plan by a class of claimants on acceptance by that class of creditors holding at least ***two-thirds in amount*** and a majority in number of the allowed claims of the class. *See* 11 U.S.C. § 1126(c).  Confirmation of a plan under section 524(g) requires meeting a heightened numerosity threshold—75% of claimants in ***each class*** whose claims are to be addressed by a 524(g) trust must vote to accept the plan.  *See* 11 U.S.C. § 524(g)(2)(B)(ii)(bb) (explaining that the voting threshold applies to "***classes*** of the claimants whose claims are to be addressed by a trust" (emphasis added)).  Thus, any plan will need 75% by number of claims in each class ***and***, at minimum, ***two-thirds in value*** of claims in each class to vote to accept the plan.  LTL has made no showing it could succeed under these standards.

In addition, LTL has not explained how J&J could benefit from a channeling injunction under 11 U.S.C. § 524(g) for its own direct and independent liability in the face of the Third Circuit's decision in *In re Combustion Eng'g*, 391 F.3d at 233, holding such injunctions unavailable in such circumstances. LTL does not explain how it can have a successful reorganization when the relief it deems indispensable is statutorily precluded.

Because LTL cannot demonstrate a reasonable likelihood of successful reorganization, its motion for a preliminary injunction must be denied. *Holland*, 895 F.3d at 286 (the "first two factors are prerequisites for a movant to prevail").

### B. The Bankruptcy Court's Finding Of Irreparable Harm Contravenes the Third Circuit's Holding and Is Otherwise Legally Erroneous

The bankruptcy court also erred in finding irreparable harm. The court found that "liquidation of individual talc claims via trial verdicts will have an adverse impact on the bankruptcy estate by hindering mediation efforts, impacting the claims liquidation and estimation process, and possibly strengthening insurance defenses against

coverage—all of which will impair reorganization efforts and drain resources and time."[98]  This is legal error.

**First**, it is foreclosed by the Third Circuit's decision.  In holding that, "[a]t best," LTL's petition "was premature," the Third Circuit observed that "in the context of a mass tort bankruptcy," a "longer history of litigation outside of bankruptcy may provide a court with better guideposts when" estimating claims and thus "fairly compensating claimants with wide-ranging degrees of exposure and injury."  *In re LTL Mgmt., LLC*, 64 F.4th at 109. Thus, the Third Circuit explicitly held additional litigation would *assist*—not hinder—the estimation process to determine the valuation of claims (which in turn, logically, would help with mediation efforts).

The bankruptcy court attempted to decontextualize this observation by stating "the Third Circuit made those statements in the larger context of discussing the many forms of financial distress that can lead to a hypothetical debtor's chapter 11 bankruptcy filing and the many factors that must be considered."[99]  Not so.  The observation was made

---

[98] PI Op., at 336A.

[99] PI Op., at 336A–337A.

when explaining why LTL's resort to the bankruptcy code at this juncture "was premature[.]" *In re LTL Mgmt.,* 64 F.4th at 103. In fact, in the footnote at the end of that sentence, the Third Circuit favorably cited the example of the A.H. Robins trust, in which "the Court and stakeholders had the benefit of data from 15 years of tort litigation by A.H. Robins before its filing." *Id.* at 103 n.13.

The only reasonable interpretation of the Third Circuit's observation is that waiting to invoke bankruptcy protections until ***after*** allowing claims to proceed would be helpful to the bankruptcy process. The bankruptcy court cannot conclude that further litigation data (against non-debtors) would impair reorganization efforts if the Third Circuit concluded it would be helpful to those efforts.

***Second***, the bankruptcy court's observation that continued litigation would "drain resources" cannot constitute irreparable harm as a matter of law. LTL would not be a party to any talc action against a non-debtor. It could not be subject to collateral estoppel or res judicata. Any harm to LTL would be self-inflicted—a product of its own decision to volunteer in a proceeding in which it is not a party. *See, e.g.*, *Webb v. Phila. Gas Works* (*In re Webb*), 38 B.R. 541, 545 (Bankr. E.D. Pa. 1984)

(court denied injunction, partially because "debtor's difficulties are due to her own course of conduct"); *In re Madera*, No. ADV 06-417, 2008 WL 447497, at *9 (E.D. Pa. Feb. 7, 2008), *as amended* (May 7, 2008) (preliminary injunction denied: "If appellants face the prospect of irreparable harm, it is very much of their own making.").

In any event, the Third Circuit has "long held that an injury measured in solely monetary terms cannot constitute irreparable harm." *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 562 F.3d 553, 557 (3d Cir. 2009). The fact that litigation in the tort system is expensive does not justify suspending the rights of the injured "to prove to a jury of their peers injuries claimed to be caused by a consumer product." *In re LTL Mgmt.*, 64 F.4th at 111. Because LTL cannot demonstrate irreparable harm, its motion for a preliminary injunction must be denied.

### C.   The Bankruptcy Court Erred in Failing to Recognize That the Talc Claimants Are Being Gravely Harmed By the Continued Deprivation of Their Right to Trial

The next factor requires a court to consider "whether granting preliminary relief will result in even greater harm to the nonmoving party." *McTernan v. City of York, Pa.*, 577 F.3d 521, 526 (3d Cir. 2009). In considering the harm to the nonmoving party, the bankruptcy court

stated that it "does not perceive **any harm** to the Talc Claimants in imposing" the preliminary injunction because claimants "may proceed with litigation up to the point of trial,"[100] except in the MDL, where the case is completely frozen.[101] This conclusion is as incorrect as it is galling.

***First***, the Third Circuit has already held that the talc claimants' rights to "prove to a jury of their peers injuries claimed to be caused by a consumer product," should be disrupted "only where necessary." *In re LTL Mgmt.*, 64 F.4th at 111 (emphasis added). As discussed throughout this brief, it is not "necessary" to disrupt that right here. But to have the bankruptcy court dismiss that disruption of a fundamental right as not causing "***any*** harm" is wildly out of step with precedent.

***Second***, the Third Circuit has long recognized that asbestos claimants "being forced to wait . . . before their causes are heard" results in "clear damage" and constitutes a "hardship." *Johns-Manville*, 723 F.2d at 1076. In that case, the Court held that it "cannot ignore the fact that plaintiffs and crucial witnesses are dying, often from the very diseases that have led to these actions." *Id.* Thus, it concluded that

---

[100] PI Op., at 337A–338A.

[101] No legal basis was stated for treating federal and state court victims differently.

although the "defendants may be seriously inconvenienced by the resumption of the actions against them," the "balance of hardship weighs in favor of the injured plaintiffs." *Id.*

Other Courts of Appeals are in accord. For example, the Fifth Circuit determined that a stay was properly denied because

> the requisite balancing of the competing interests involved in these cases weighs in favor of allowing the remaining actions to proceed. The realities of the hardship of a stay on the plaintiffs, many of whom allege that they are dying from asbestosis, is substantial and, in some instances, permanent. ***The grim reaper has called while judgment waits.***

*Wedgeworth v. Fibreboard Corp.*, 706 F.2d 541, 545 (5th Cir. 1983) (emphasis added). The Fourth Circuit similarly held that when "balancing the competing interests of the parties" the court should consider "the human aspects of the needs of a plaintiff in declining health as opposed to the practical problems imposed by the proceedings in bankruptcy," and it concluded that a "stay under such circumstances would work a ***manifest injustice*** to the claimant." *Williford*, 715 F.2d at 127–28 (emphasis added).

Here, a manifest injustice is precisely what the Debtor is seeking to achieve. Indeed, the contrast between the negligible (if any) harm to the

Debtor's estate claimed by the Debtor—all backstopped by one of the richest companies in the world—and the immense harm to dying victims could not be more stark.  The victims of J&J are sick and dying.  Many of the victims have been litigating against J&J for years. The PI Order will deprive many of their day in court during their lifetimes.  As the U.S. Trustee observed, "[f]or nearly eighteen months, tens of thousands of cancer victims and other personal injury plaintiffs have been barred from pursuing their rights against a wide range of non-debtor defendants, all for the benefit of a chapter 11 case that the Third Circuit ruled never should have been filed."[102]  The U.S. Trustee concluded that "[t]o subject these victims to any additional delay would be unconscionable."[103]

### D. The Bankruptcy Court Erred In Finding That the Public Interest Weighed in Favor of Suspending Talc Claimants' Rights to Trials And Appeals

The bankruptcy court concluded that granting the preliminary injunction would be in the public interest because it would serve "the desires and interests of the claimants who purportedly are in support of

---

[102] Objection of the United States Trustee to Debtor's Motion, at 195A–196A.

[103] *Id.*, at 196A.

the Debtor's reorganization and the settlement proposed therein."[104] That conclusion is flawed.

The purported support is drastically overstated for the reasons discussed above. In any case, no one is preventing the claimants who wish to settle with LTL or its affiliates from doing so.  Without the PI Order, each claimant could choose to settle or choose to bring their case before a jury.  There is no risk that the entities that actually caused the future claimants' injuries (J&J and other members of the Fortune 500) will be insolvent or dissolved in the absence of a stay or injunction.

Moreover, the PI Order does not serve any purpose in aiding the Debtor's reorganization efforts, as there is no genuine business to reorganize, no employees or trade creditors to protect, and no larger social interest in LTL's continued operation.  The only interests that would be advanced here is the interest of J&J in halting all litigation and gaining a litigation advantage over tens of thousands of pending cases.

There is no logical stopping point to the Debtor's strategy. Any rich company facing liabilities could completely stymie litigation simply by allocating them to a new entity and putting the entity into bankruptcy.

---

[104] PI Op., at 338A.

The bankruptcy courts would be flooded with abusive petitions, courts would be unduly burdened, and public confidence in the fair administration of the bankruptcy system would be undermined. If permitted to succeed, the Debtor's strategy would undermine the multi-district litigation system that Congress established in 28 U.S.C. § 1407 to centralize, efficiently manage and ultimately settle mass tort actions and other litigations alleging the same claims and injuries. The charade that the Debtor seeks to stage is not in the public interest, and, if entertained, would open the flood gates to more abuse.

If J&J or Old JJCI had chosen to declare bankruptcy in good faith, it would have been entitled to the benefit of an automatic stay and other bankruptcy relief. But they deliberately created LTL as a separate entity; to consolidate all talc liabilities in it; to strategically "ringfence it" from J&J's profitable business operations; and to put LTL alone into bankruptcy. Having done so, they cannot demand that equity save them from the consequences of those choices by granting them statutory relief from which they deliberately excluded themselves. Equity will not "relieve parties from the consequences of their own negligence or folly," much less strategic choices. *Dunphy v. Ryan*, 116 U.S. 491, 498 (1886).

65

## <u>CONCLUSION</u>

The bankruptcy court's PI Order should be vacated.

Respectfully submitted,

**GENOVA BURNS, LLC**
/s/ *Daniel M. Stolz*
Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
110 Allen Road, Suite 304
Basking Ridge, NJ 07920
Telephone: (973) 533-0777
Facsimile: (973) 467-8126
Email: dstolz@genovaburns.com
Email: dclarke@genovaburns.com

*Local Counsel to the Official
Committee of Tort Claimants of LTL
Management, LLC*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Bankruptcy Procedure 8015(a)(7)(B)(i), the undersigned certifies that this principal brief contains no more than 13,0000 words.

<u>*/s/ Daniel M. Stolz*</u>
Daniel M. Stolz, Esq.